IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 2, 2021

## IN RE WILLIAM B.

**Appeal from the Juvenile Court for Rutherford County
No. TC-3799   Donna Scott Davenport, Judge**

_____

### No. M2020-01187-COA-R3-PT

_____

Mother appeals the termination of her parental rights to one child. In addition to disputing the grounds for termination and best interest, Mother argues on appeal that she should have been appointed counsel in the termination proceeding and that the Tennessee Department of Children's Services violated Tennessee Code Annotated section 33-6-401. We conclude that the record demonstrates that Mother expressly waived her right to counsel and failed to show that the waiver was ineffective.  We further hold that section 33-6-401 was inapplicable in this case. Finally, we conclude that clear and convincing evidence was presented of both the grounds for termination and that termination is in the child's best interest. As such, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and W. NEAL MCBRAYER, JJ., joined.

Carl R. Moore, Murfreesboro, Tennessee, for the appellant, Tesha L. B.

Herbert H. Slatery, III, Attorney General and Reporter; Lexie A. Ward, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

### OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

On April 15, 2017, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") received a referral regarding a lack of supervision against

Respondent/Appellant Tesha L.B. ("Mother").[1] The referral stated that Mother called 911 because the child, who was a little over two months old, was having difficulty breathing. The EMS workers who arrived at the scene reported that Mother did not appear to have proper infant supplies. While at the hospital, Mother was observed acting in an erratic and paranoid state. Mother also informed staff that she was "not in the right mind to make medical decisions" for the child and signed all medical decision-making over to the child's doctors.[2]

Training officer and child protective services assessor, Maya Sanchez, spoke with Mother on April 15. Mother claimed during this meeting that she could lay her child down wherever she pleased, even on his stomach. As a result, DCS provided Mother with safe sleep information. Mother also informed DCS that the child should be able to sit up at two months old, claimed that the child was vegan, and stated that although she was supplementing breastfeeding with formula, she was limiting the child to only a certain number of ounces per day and was not feeding the child after daycare. Still, DCS determined that removal of the child was not necessary.

Ms. Sanchez and Juliana Potter, another child protective services assessor, met with Mother on April 17, 2017 at the DCS office. Mother was calm at times during the meeting, but then quickly transitioned to angry yelling and screaming. During the meeting, DCS created a noncustodial permanency plan that required, inter alia, that Mother complete a clinical psychological assessment. According to later testimony, Mother signed the plan but then put a large "X" over her name. Mother also slammed her hand on the table during the meeting, which appeared to scare the child.

On April 21, 2017, DCS filed a non-custodial services petition in the Rutherford County Juvenile Court ("the juvenile court" or "the trial court") to order Mother to participate in services with DCS. There is no dispute that Mother was never served with

---

[1] To protect the identity of children in parental rights termination cases, initials are used instead of last names.

[2] In her reply brief, Mother asserts that there was no evidence presented that the events that led to DCS involvement occurred. Respectfully, we disagree. Here, during the termination trial, DCS workers testified as to what led to their involvement with Mother and the child. No objection was ever made that the DCS workers could not testify as to those facts or that this testimony could not be presented for the truth of the matter asserted, due to a lack of personal knowledge or otherwise. Moreover, Mother did not raise any argument in her initial brief that this testimony was not properly considered as substantive evidence. Instead, she raised this issue in a cursory fashion in her reply brief. This is not a proper way to raise this evidentiary issue. *See* Tenn. R. Evid. 103 (requiring a timely objection when an error is predicated on the admission of evidence); **Owens v. Owens**, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) ("A reply brief is a response to the arguments of the appellee. It is not a vehicle for raising new issues."). As a result, we conclude that DCS did submit proof as to what led to their involvement with the child that can be considered in this appeal. Moreover, as made clear throughout this Opinion, DCS's decision to remove the child occurred after a multitude of personal interactions between Mother and various DCS workers, all of whom testified about their interactions with Mother at trial.

this petition, and it was ultimately dismissed.

DCS attempted to work with Mother on the noncustodial plan for the two weeks that followed the filing of the non-custodial services petition. Mother was generally uncooperative. Mother claimed that she did not need to work services because the child's alleged biological father was going to take custody of the child.[3] But Mother provided no documentation to support that claim or her claim that she was married to the child's father. Indeed, Mother never provided proof that she and the biological father were married, and the father's conduct throughout the course of this case indicated that he did not intend to take responsibility for the child in any manner. At times, DCS was unable to make any contact with Mother.

What came next is somewhat difficult to discern from the record. A hearing on the unserved petition for court-ordered services was held before a juvenile magistrate on May 3, 2017. Mother was unsurprisingly not present. By this time, DCS had apparently come to believe that the child needed to be placed in DCS custody. An order was later entered on June 19, 2017,[4] from this hearing, which states that the matter presented on that date was whether there was probable cause to find the child dependent and neglected. As of May 3, however, no such petition had been filed. The magistrate nevertheless conducted a hearing in which testimony was heard. The magistrate first noted that Mother had not been served because she had absconded with the child. The magistrate further found that

> Mother has displayed some disturbing mental and emotional instability as evidenced by not only her behaviors but also her actions; Mother exhibited very odd behaviors while at the Hospital as alleged in the State's Petition; Mother's reactions to hospital staff is of concern to the Court and a demonstration of Mother's mental and emotional instability; Mother's further reactions to the DCS Workers to the point where the Mother called 911 on DCS during a [Child and Family Team Meeting] gives the Court concerns as to Mother's emotional and mental stability . . . .

The magistrate also found that Mother failed to comply with any of the requirements and tasks requested by DCS. The magistrate therefore ruled that there was probable cause to believe that the child was dependent and neglected and placed the child in DCS custody. The order was mailed to Mother's last known address.

In the afternoon following the May 3, 2017 hearing, DCS workers arrived at Mother's home, but she did not answer the door. A sign on her door indicated that Mother

---

[3] Only one man has ever been alleged to be the child's biological father in this case.
[4] The order is marked as "lodged" on a date in May. However, the exhibit sticker was placed over this stamp and nothing more than a partial date of "5-1" is visible. We assume that this order was therefore "lodged" between May 10th and May 19th.

was out of town. But the DCS workers observed Mother leaving her apartment on this date and attempted to flag Mother down. She did not stop, and eventually sped away from the DCS workers with the child in the car. The DCS workers called 911 for assistance, and a "be on the lookout" was requested. Mother did not initially answer calls or texts, but did call Ms. Potter later that afternoon. In that call, Mother called Ms. Potter a "psycho b****" and directed DCS to stop calling Mother. During this phone call, Mr. Potter informed Mother that the child had been placed in DCS custody and that Mother needed to present the child to DCS. Mother refused.

On May 4, 2017, DCS formally filed a petition to declare the child dependent and neglected and for emergency temporary legal custody. On May 5, 2017, a juvenile magistrate entered an ex parte custody order and an order for Attachment Pro Corpus commanding the Sheriff to deliver the child to DCS. Although Mother was informed that the child had been placed in DCS custody by the juvenile court, she refused to hand the child over to DCS. Instead, DCS did not obtain physical possession of the child until August 14, 2017. On that date, DCS located Mother through TennCare and arrived with a police escort at the listed address to remove the child. Mother called the police on DCS, attempted to leave with the child, and accused DCS of trying to steal her child. Mother eventually allowed the child to be removed after being threatened with criminal charges. The child was placed in the home of a foster family, where he remained at the time of trial.

On August 23, 2017, Mother filed a pro se motion in the dependency and neglect action for the return of her child. Mother later filed a motion for a court-appointed attorney on September 1, 2017. Mother was served with the dependency and neglect petition on or about September 6, 2017. On the same day, a juvenile court magistrate appointed attorney Richard Roney to represent Mother. Also on that day, Mother, by and through counsel, waived her right to a probable cause hearing. A juvenile magistrate later entered an order denying Mother's pro se motion.

On October 18, 2017, Attorney Roney filed a motion to withdraw on the basis of a fundamental disagreement as to how the case should be defended and Mother's efforts in filing pro se motions.[5] In this motion, Attorney Roney stated that Mother "insists" that she will not complete a psychological assessment requested by DCS. A juvenile magistrate granted the motion to withdraw on October 25, 2017, and directed Mother to seek "another appointed counsel if she qualifies." On November 1, 2017, a second attorney, Kim Gilleland, was appointed to represent Mother.

---

[5] Mother filed a number of pro se motions in the dependency and neglect action throughout its pendency. Some motions attacked the entirety of the dependency and neglect action because Mother had not been served with the noncustodial petition for court-ordered services. Other motions objected to a third-party supervising visitation despite the court order allowing a third-party to do so. None of the motions were granted.

A second permanency plan was created on November 29, 2017.[6] This plan, like the four that followed, contained requirements related to income, housing, drug and alcohol use, and transportation. The second permanency plan also specifically required that Mother obtain a psychological evaluation and follow recommendations. Mother was also required to complete any necessary releases of information concerning her treatment and try to obtain required services through her insurance. Mother signed this plan at the time that it was created.[7] A Criteria and Procedures for Termination of Parental Rights was also included with the second permanency plan, but the document indicates that Mother refused to sign the document.[8] The trial court's later order ratifying this plan, however, specifically found that Mother was provided a copy of the Criteria.

Funding for the psychological assessment was approved in October 2017; however, Mother was initially reluctant to participate. According to family services worker Alexandra Brislin, Mother claimed that because DCS paid for the assessment, they "were paying for the responses [they] wanted." Mother also claimed to Ms. Brislin that she had the credentials to diagnose herself and that she had already completed an assessment; Mother did not, however, sign any releases or provide records to substantiate that claim.

Despite her reluctance, Mother also began the psychological assessment with Licensed Psychologist Janie Berryman in December 2017; a report on the assessment was completed March 13, 2018. Mother's intelligence functioning was reported as average, but Dr. Berryman opined that Mother may be suffering from an adjustment disorder "with mixed emotional features." The report, however, ruled out "Personality Disorder NOS" and an anxiety disorder. Overall, however, Dr. Berryman opined that "[t]he test results were defensive and not considered valid making it difficult to diagnosis for specific treatment." Dr. Berryman therefore recommended that Mother complete anger management, parenting classes, and individual therapy, and that supervised visitation continue until there was a period of consistent positive interactions with the child. Mother did complete both anger management and parenting classes in February 2018 and April 2018, respectively.

By and through appointed counsel, Mother entered into an agreed order with DCS on January 19, 2018, to have a minimum of four hours of supervised visitation with the child supervised by Omni Vision or another person approved by DCS.

On August 13, 2018, an agreed order was entered finding the child dependent and neglected. Although the order stated that Mother's superior parental rights were reinstated, it was agreed that the child would remain in DCS custody due to improper control and that

---

[6] The first plan was created while Mother was on the run with the child.
[7] Mother also signed some of the plans that followed.
[8] Later permanency plans also indicated that Mother refused to sign the Criteria. The May 2017 permanency plan has a handwritten note that the Criteria was mailed to Mother.

Mother would participate in an in-depth psychological assessment and individual counseling on a consistent basis. On November 2, 2018, Mother's second appointed attorney filed a motion to withdraw, citing Mother's increased frustration with the representation. A juvenile magistrate entered an order allowing the withdrawal on January 8, 2019. It appears that no additional counsel was appointed to represent Mother in the dependency and neglect proceeding.

On July 30, 2019, DCS filed a notice with the trial court that it had temporarily suspended Mother's visitation due to her behavior. DCS asked the juvenile court to find that its action was appropriate and to order that the suspension remain in effect until Mother completed the second psychological assessment. A hearing was held on this motion on September 5, 2019, before a juvenile magistrate. Mother appeared pro se at the hearing. After hearing the testimony from the Omni supervisor, Megan Bowden, the juvenile magistrate found that it was in the child's best interest for visitation to be suspended until the parties agreed or a motion was filed for visitation to resume. The juvenile magistrate did not, however, accept the characterization that Mother "has 5 different identities"; but the magistrate concluded that Mother experiences "grandiose belief or ideas of degrees, doctorates, competencies and professions" without any evidence in support and is unable to focus on visiting with the child in a manner that is in the child's best interest. Nothing in the record on appeal indicates that Mother appealed any of the orders entered in the dependency and neglect proceeding, including the order suspending her visitation that was entered when Mother was not represented by counsel.

In the meantime, on July 19, 2019, DCS filed a petition to terminate Mother's parental rights on grounds of abandonment by failure to visit, failure to support, and failure to establish a suitable home, substantial noncompliance with permanency plans, failure to manifest a willingness and ability to personally assume custody, and persistent conditions.[9] Although the petition was also filed in the Rutherford County Juvenile Court, it was filed under a different docket number, and is a separate case, from the dependency and neglect action. A summons in the record indicates that Mother was personally served with the termination petition on July 19, 2019, in the juvenile court lobby.

DCS, the guardian ad litem for the child, and Mother appeared before a juvenile magistrate for a first appearance on the petition on September 5, 2019. At that time, the juvenile magistrate explained Mother's right to request court appointed counsel. Mother, however, stated that she wanted to represent herself or hire private counsel. As a result, Mother and the juvenile magistrate signed a one-page document in which Mother waived her right to appointed counsel. The juvenile magistrate later entered a written order on September 17, 2019, noting that Mother had waived her right to appointed counsel

---

[9] The petition also alleged grounds to terminate the parental rights of the child's biological father. The trial court terminated the father's rights in a separate order. He has not appealed, and therefore his rights are not at issue in this appeal.

- 6 -

following an explanation of that right and the responsibilities that Mother would assume.

The termination trial as to Mother began on June 8, 2020 and concluded on June 22, 2020.[10] At the start of trial, Mother requested that the trial be continued to allow her to obtain an attorney. The trial court denied that request, citing Mother's waiver and her failure to make that request in the eight months that the petition had been pending. DCS called a variety of DCS employees who had worked with Mother since the start of the case. Mother raised a multitude of objections, most of which were denied by the trial court as not being proper. Mother's objections often related to her contention that the case was void because she had not been served with the non-custodial services petition or because DCS had not complied with the mental health provision in Title 33 of the Tennessee Code.[11]

DCS presented a variety of witnesses, including Ms. Sanchez, Ms. Potter, Ms. Brislin, other DCS workers who took over the case as the years progressed, Ms. Bowden, and the child's foster mother. At trial, there was generally no dispute that Mother had sufficient income and proper housing for the child. Instead, the issues generally concerned Mother's mental health struggles and her refusal to participate in services for that purpose, and Mother's conduct during visitation. The proof demonstrated that six permanency plans were created in this case, on May 15, 2017; November 29, 2017; February 22, 2018; January 30, 2019; July 17, 2019; and January 7, 2020. Each permanency plan was ratified by the juvenile court. The permanency plans contained requirements that Mother (1) maintain safe and stable housing and provide proof of same to DCS; (2) obtain required services through her insurance or inform DCS of the termination of her insurance; (3) obtain and maintain stable employment and provide proof to DCS; (4) provide DCS with updated contact information as necessary; (5) present herself to DCS and to the trial court; (6) complete a psychological evaluation and follow all recommendations; (7) allow DCS to complete home visits; (8) sign a release of information form allowing DCS to obtain records from her physicians and service providers; (9) develop a child care and transportation plan; (10) submit to and pass drug screens; and (11) complete an alcohol and drug assessment and follow recommendations. The plans were updated after Mother completed the first mental health assessment and agreed to take part in a second assessment to reflect that the second assessment and following the recommendations were among Mother's responsibilities.

DCS assisted Mother by setting up counseling with Bowdoin Recovery Services, LLC. During the more than three years that this case was pending, Mother completed three individual therapy sessions from April 18, 2018, to May 9, 2018. The therapist found that Mother "displayed in the counseling session, exaggerated distorted description about herself and delusional thought patterns. It is very difficult to get her to focus on treatment and planning with the goal of regaining custody." As a result, Mother's therapist

---

[10] The termination of Father's parental rights occurred following a separate trial in August 2020.

[11] This issue is discussed in detail, *infra*.

recommended a more in-depth mental health evaluation "to assess for mental health medication and to assist in the treatment planning process." Thereafter, it appears that Mother refused to contact Bowdoin. Mother's DCS workers testified that Mother provided them with no documentation to reflect that she had received any additional counseling. Indeed, Mother's refusal to sign releases of information as required by the permanency plans was a consistent issue in this case; Mother either refused to sign the forms or revoked the form that she did sign. Although Mother was told that DCS would pay for the assessment if she provided proof that her own insurance would not cover the cost, she never completed the second assessment.

Ms. Brislin supervised visitation until November 2017, when Omni took over.[12] As discussed in more detail, *infra*, Mother was fairly consistent in the frequency of her visits, but her conduct was inconsistent. While in some visits Mother was appropriate, Mother's conduct was highly inappropriate in others. In one early visit, Mother intentionally startled and made loud noises in front of the child so that he would not be a "scaredy-cat" even though she had been informed that the child was suffering from an ear infection. The child was less than one-year old at the time.

Even during the later visits, Mother was often unable to display parenting skills and knowledge. Sometimes, Mother spent more time complaining about the case than interacting with her child. Other times she yelled at or became angry with the child when he did not meet her standards.[13] Mother's aggression also took the form of rubbing the child's face with the food he refused to eat, holding the child down on the potty when he had a bowel movement in his diaper, "bonking" her head gently, but repeatedly against the child's even though he expressed that he did not like it, and getting into the child's face to scold him and threaten to spank him when he did not follow her directions. In yet other times, she refused to engage with the child, claiming that adults did not play with toys, or spent the visitation time on her phone. The child at times called both Mother and Ms. Bowden "mommy." Both directed the child not to call them that, with Mother telling the child to call her by her first name.[14] At the end of the visits, the child was often happy to see the DCS worker who transported the child to the visits and had no difficulty leaving Mother; instead, the child often disengaged from Mother during the visits when she was too angry or aggressive toward him. Some of the visits ended early due to Mother's behavior.

Mother's erratic behavior was often on full display during the visits. Mother often

---

[12] The delay in using Omni related to Mother's refusal to sign necessary releases.

[13] Examples are where the child did not complete a puzzle, could not reach the sink to help her wash dishes, could not pull up his own pants or diaper, did not respond to Mother's statements that they should "bond," could not put his own pants or shoes on, and had a bathroom accident. At the time that all of these events occurred, the child was little over two years old.

[14] During a later visit, however, Mother continuously asked the child if he "love[d] Mommy" and wanted to "bond with Mommy."

spoke of her various degrees and credentials, ranging from being a nurse to a doctor to a psychologist to owning a successful security company that worked with celebrities; Mother never provided any documentation to support those claims. Despite claiming that she had a chemistry degree, Mother had to be shown how to make formula for the child. Mother continued her claims of degrees and credentials at various visitations throughout the pendency of the case. Often, Mother's mood vacillated from calm and appropriate to angry during the visits. At one visit in October 2018, Mother arrived acting "manic" and attempted to extort DCS into allowing her to leave with the child with the promise that she would provide them with the results of her purported second psychological evaluation.[15] Mother referred to this deal as an "even trade." When DCS refused, Mother became enraged, and Mother was eventually escorted out by non-emergency police officers. Mother chose not to visit with the child in November and December 2018 after this incident.

In the Spring of 2019, Mother's eight hours of supervised therapeutic visitation were limited to four hours due to Mother's conduct. A court appointed special advocate was also brought in to provide additional observation of the visitation. But Mother's conduct during visitation did not improve in 2019. Rather, nearly every single visit involved some erratic, aggressive, or indifferent behavior by Mother. For example, at the June 28, 2019 visit, Mother forced the child to kiss her even after he said no, Mother attempted to force the child to remain in a chair, and Mother informed the then two-year-old child not to say "yes, ma'am" or "no, ma'am" because those terms were associated with slavery. According to Ms. Bowden, Mother then "pulled out her phone and read[] graphic, disturbing details" to the child that were not appropriate given the child's age. When Ms. Bowden asked Mother to stop, Mother became so agitated that Ms. Bowden was forced to end the visit early, as the child was visibly scared of Mother.

Mother's last visit with the child occurred on July 25, 2019, after which DCS determined that visitation was no longer in the child's best interest. In a later order suspending the visits, the trial court characterized Mother's visitation as follows:

> [T]he last visit on July 25, 2019 deteriorated to a greater extent than prior visits wherein an original statement by the Child while in a state of play was interpreted by [Mother] as a statement of harm, when it was clear from the state of play and from the testimony that the Child said "Batman and another superhero were fighting and his imaginary character got hurt" and the Mother interrupted it as "Badman" and asked the Child where did the "Badman" hurt you; further the Mother asked where did the "Badman" hurt you and the Child said on his head referring to "Batman", but of particular note is that there was no visible injuries or bruises of any type on the Child's

---

[15] Mother arrived to the visitation with a raincoat for the child, apparently expecting to leave with him.

head to support the Mother's accusations; further the Court notes the Child is approximately 2 years of age and is therefore very susceptible to be lead down the path that Mother was attempting to lead him on by her efforts to try and convince him that his word "Batman" was actually the word "Badman"; subsequently [Mother] called 911 and response was made to the DCS office by law enforcement, EMTs, fire and medical transport;

[O]n [] July 25, 2019, upon law enforcement arriving at the DCS office the Mother's interactions with the Police appear to be much like the interactions the Court has had with [Mother] as evidenced by the testimony by Ms. Bowden as to the interactions between the Mother and Law Enforcement on that day, specifically at times the Mother comes across as incoherent, sort of rambling, interactions wherein the Mother interjects and represents that she has multiple degrees or expertise that she believes or feels she holds that she believes give her credence to make decisions to override or overrule the concerns that everyone has about a certain situation based upon her asserted level of expertise in a particular field that is related to the situation that is under discussion at that time; . . . .

The child's foster mother, Ursula B. ("Foster Mother") testified that the child came into her custody in August 2017; he has remained continuously with her family since that time, a period of nearly three years at the time of trial. The child refers to Foster Mother and her Husband as "mommy" and "daddy." Foster Mother testified that the child is thriving in her care, that the child is bonded to her other child, and that she wishes to adopt the child should he become available.

Mother testified on her own behalf.[16] Mother's testimony generally focused on the circumstances surrounding DCS's initial involvement with the case. Mother claimed that the DCS workers trespassed in her apartment. Mother further asserted that she took good care of her son, and that she had done nothing wrong, as she "take[s] medicine to the police. I'm around the police all day long. So I know good and well that I don't have no warrants for the police to be chasing me around." Mother also took issue with the petition for court-ordered services, as it was dismissed. Mother also claimed for the first time that she had not been served with the dependency and neglect petition. Finally, Mother argued that the proceeding was void because DCS did not present a "certification of need for mental health services as required by Title 3,—Chapter 3, 4, 5, and 6."

On August 7, 2020, the trial court entered a fifty-seven-page order terminating Mother's parental rights. Therein, the trial court first addressed Mother's request for

---

[16] Mother often interjected comments during her objections to DCS's proof. For example, Mother referred to DCS's actions as "terrorism" and told a DCS witness that she could "burn in hell." The trial court admonished Mother on multiple occasions not to commit these outbursts and not to attempt to testify during DCS's case-in-chief.

counsel, ruling that she had waived her right to appointed counsel months prior to trial. The trial court then noted that DCS had elected to "drop" its allegation of failure to support. But the trial court found that DCS had presented clear and convincing evidence of all other grounds for termination alleged in the petition and that termination was in the child's best interest.

An order was later entered terminating the parental rights of the child's biological father. Mother thereafter timely appealed to this Court. On September 9, 2020, Mother filed a motion to proceed as indigent in this appeal. On September 10, 2020, we granted Mother's motion and remanded the matter to the trial court for the sole purpose of appointing counsel to represent Mother in this appeal. On October 5, 2020, the trial court appointed Mother's current counsel to represent her in this appeal.

## II. ISSUES PRESENTED

Mother raises the following issues for review, which are taken from her appellate brief:

1. Whether DCS and the juvenile court violated Mother's rights by attempting to force her into unwanted medical treatment.
2. Whether the trial court erred in denying Mother's request for counsel.
3. Whether the trial court properly determined that grounds existed to terminate Mother's parental rights.
4. Whether the trial court properly determined that termination of Mother's parental rights was in the child's best interest.

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL

1021618, at \*7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* at 524 (citation omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings." *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.,* 984 S.W.2d 912, 915 (Tenn.1999)). "Further, '[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings.'" *Id.* (quoting *Galbreath v. Harris,* 811 S.W.2d 88, 91 (Tenn.Ct.App.1990)).

## IV. DISCUSSION

### A. Counsel

We begin with Mother's argument concerning the appointment of counsel. As this Court recently explained,

Although the Due Process Clause of the United States Constitution does not "require[] the appointment of counsel in every parental termination proceeding[,]" *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 31, 101 S. Ct. 2153, 68 L.Ed.2d 640 (1981), "Tennessee statutorily provides the right to appointed counsel for indigent parents in every parental termination proceeding," *In re Carrington H.*, 483 S.W.3d at 527; *see also* Tenn. Code Ann. § 37-1-126(a)(2)(B)(ii) ("A parent is entitled to representation by legal counsel at all stages of any proceeding under this part

in proceedings involving . . . [t]ermination of parental rights pursuant to § 36-1-113.").

*In re Tavarius M.*, No. M2020-00071-COA-R3-PT, 2020 WL 7479411, at *3 (Tenn. Ct. App. Dec. 18, 2020). The right to counsel, however, is not absolute, and may be waived by the parent. Specifically, Rule 13 of the Tennessee Supreme Court Rules provides that indigent parties are entitled to the appointment of counsel in "[p]roceedings to terminate parental rights." Tenn. Sup. Ct. R. 13(d)(2)(D). Rule 13 further provides, however, that "[u]pon finding a party indigent, the court shall enter an order appointing counsel unless the indigent party rejects the offer of appointment of counsel with an understanding of the legal consequences of the rejection." Tenn. Sup. Ct. R. 13(e)(3). "If an indigent party refuses to accept the services of appointed counsel, such refusal shall be in writing and shall be signed by the indigent party in the presence of the court." Tenn. Sup. Ct. R. 13(f)(1). The rule further provides as follows:

> The court shall acknowledge thereon the signature of the indigent party and make the written refusal a part of the record in the case. In addition, the court shall satisfy all other applicable constitutional and procedural requirements relating to waiver of the right to counsel. The indigent party may act pro se without the assistance or presence of counsel only after the court has fulfilled all lawful obligations relating to waiver of the right to counsel.

Tenn. Sup. Ct. R. 13(f)(2).

Much of the caselaw concerning the waiver of the right to appointed counsel in the context of a termination of parental rights trial concerns whether the parent implicitly waived the right through his or her conduct. *See, e.g.*, *In re A.P.*, No. M2017-00289-COA-R3-PT, 2019 WL 1422927, at *3 (internal citation removed) (quoting *In re Jamie B.*, No. M2016-01589-COA-R3-PT, 2017 WL 2829855, at *4 (Tenn. Ct. App. June 30, 2017)) (Tenn. Ct. App. Mar. 29, 2019) ("While a parent's right to appointed counsel in a termination of parental rights proceeding is well-established in Tennessee, this Court has also acknowledged that where a parent fails to adequately cooperate or communicate with their counsel before trial, the client may have impliedly waived the right to appointed counsel by his or her conduct."); *In re Elijah B.*, No. E2010-00387-COA-R3-PT, 2010 WL 5549229, at *5 (Tenn. Ct. App. Dec. 29, 2010) ("The issue becomes whether Father effectively waived his right to counsel by failing to communicate with Ms. Luther in the months leading up to the hearing and then leaving her to appear without him."); *In re M.E.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *12 (Tenn. Ct. App. Aug. 16, 2004) ("Thus, we must determine whether Father's conduct constituted such a waiver."). That is not the situation presented in this case.

Instead, this case involves an express waiver by Mother of her right to appointed counsel despite her indigency. In particular, the record indicates that the parties appeared

before a juvenile magistrate on September 5, 2019 for a first appearance in the termination proceeding. On that date, Mother and the presiding magistrate, Magistrate Adam Dodd, signed a document entitled "Waiver of Right to Have Appointed Counsel (Termination of Parental Rights)." The document states as follows:

The undersigned represent to the court, under oath, as follows:

I have been fully informed by the court of the nature of the Petition (Petitioner seeks to terminate forever parental rights to my child/children pursuant to T.C.A. §[]36-1113) and the relief sought by Petitioner(s) (to make my child/children available for adoption) in this case; AND
The legal consequences thereof (loss of my parental rights) should said relief be granted by the court; AND
The right to appointment of counsel (an attorney) upon my representation to the court, that I am unable to employ counsel, the reasons therefore, and the court concurring with my assertion by finding me indigent.
All of which I fully understand.
Having so acknowledged, I, the undersigned, now state to the court that I do not desire the appointment of counsel, that I expressly waive the same and that I desire to appear in all respects in this case on my own behalf, unless and until such time as counsel is employed by me, all [of] which I understand I have a right to do. Further, by signing below, I appear before the court today with full knowledge of the consequences of my decision and sign this Waiver of Appointed Counsel freely and voluntarily believing it to be in my best interest.

Magistrate Dodd's September 17, 2019 order related to the September 5 appearance also contains findings relative to this issue:

Mother was personally served with the State's Petition on July 19, 2019. Mother has appeared today and the Court, on the record, explained to the Mother her right to request court appointed counsel and the process for requesting the same. Mother stated under oath that she is competent to understand today's proceedings. The Court, in great detail, went over the Mother's options regarding representation in that she could request court appointed counsel, represent herself or hire private counsel. Upon being informed of the same the Mother informed the Court of her desire and intent to retain her own attorney or to represent herself as a Pro Se Respondent. The Court explained to the Mother that if she did not retain counsel she would need to be prepared and ready to go on the trial dates set herein, further the Court directed the Mother that if she does retain counsel that her counsel would need to be prepared to go forward on the trial dates set herein and further that if the dates set herein did not work with her counsel's calendar

- 14 -

that such would not be a basis for continuing the trial dates set herein.

The order set a trial date eight months in the future, on June 8, 2020.

Nothing in the record indicates that Mother ever again raised the question of appointed counsel until the morning of June 8, 2020, when she sought a continuance because she "need[ed] a lawyer" due to the case being "very complex" and her "mental state." The trial court responded as follows:

> No, ma'am. We have given you every opportunity to get attorneys, have appointed attorneys, retained attorneys, get appointed attorneys, and I am going to go ahead and find the record speaks for itself that you've had every opportunity if you wish to retain an attorney yourself to do so. . . .
> . . . . So I'm going to note that this case has been set for eight months. You've had that time to come in and ask the Court for an appointed attorney and you have had plenty of time to retain an attorney. So I'm also going to deny that motion to appoint you an attorney, and I will note your objection to that.

The trial court noted, however, that Mother was permitted to file an oral motion that Mother was unable to proceed on the morning of trial due to her mental state. But the trial court explained that Mother would "have to have the proof" to support such an argument. Mother responded that "I'm not a lawyer, and I need a lawyer."

The trial court also addressed this issue in its order terminating Mother's parental rights. After reiterating Magistrate Dodd's findings from the September 5, 2019 hearing, the trial court stated that

> the Mother executed a waiver of her right to have or request appointed counsel and the same has been admitted as Exhibit 70 in this matter. Mother throughout the underlying Dependency and Neglect action had a total of 3 different Attorneys appointed to represent her and each Attorney had to eventually withdraw due to the actions of the Mother. Therefore the Court believes the Mother raised the issue of wanting an appointed Attorney on the first day of trial, June 8, 2020, for the sole purpose of delaying this matter therefore the Mother's oral motion for counsel is denied and the Mother will proceed as a Pro Se Respondent. Further based upon the Mother's statements to the Court on September 5, 2019, as previously noted, the Mother informed the Court of her intent to retain private counsel which tells the Court the Mother had the financial means to do so but has elected to proceed without counsel.

On appeal, Mother asserts that the trial court erred in denying her request for counsel. It is somewhat difficult to discern the exact basis for Mother's objection to the

trial proceeding. Specifically, Mother asked the trial court to continue the case to allow her to obtain counsel, pointing to her mental state. This request does not indicate if Mother wanted to revoke her waiver of appointed counsel or if Mother was merely seeking a continuance to retain her own counsel. Moreover, Mother did not argue on the morning of trial that she ever lacked the competency to exercise a waiver of her right to counsel, only that she was presently incompetent to represent herself. *See generally **State v. Hester***, 324 S.W.3d 1, 29–31 (Tenn. 2010) (discussing the difference between these two questions, as detailed *infra*). On appeal, however, Mother's argument clearly concerns whether the initial waiver was effective on procedural and substantive grounds, as she does not address in any manner the trial court's decision to deny Mother's request for a continuance. Although we have serious doubts that this issue was properly raised in the trial court, we will nevertheless address it on appeal. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review. The appellate court . . . may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process.").

Mother cites no law beyond Rule 13 to support her argument that the magistrate did not do all that was required of him to effectuate a waiver of counsel. Specifically, she cites no specific "applicable constitutional or procedural requirement" that was not met in this case. Generally, arguments made in no more than a skeletal fashion are waived in this Court. *See **Sneed v. Bd. of Pro. Resp. of Supreme Ct.***, 301 S.W.3d 603, 615 (Tenn. 2010) ("It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.").

We do note, however, that the Tennessee Rules of Criminal Procedure contain more explicit requirements for a waiver of counsel to be effective. *See generally* Tenn. R. Civ. P. 44. These include the duty of the trial court to "determine whether there has been a competent and intelligent waiver" of the right to appointed counsel. Tenn. R. Crim. P. 44(b)(1)(B). Although we have applied this rule where counsel was constitutionally mandated in the criminal contempt context, *see **Miller v. Kelk***, No. E2003-02180-COA-R3-JV, 2005 WL 1669849, at *9 (Tenn. Ct. App. July 18, 2005) (citing Tenn. R. Crim. P. 44) ("[I[f Mother was indigent and faced with being held in criminal contempt, then she would have been entitled to court appointed counsel."), we have not applied this rule in the termination of parental rights context. Indeed, this Court has previously held that certain law applicable in criminal cases that provides for "a far stricter standard" regarding the forfeiture of appointed counsel through misconduct is not applicable in matters involving termination of parental rights, which matter is civil in nature and involves a statutory right to counsel, rather than a constitutional mandate. ***In re A.P.***, No. M2017-00289-COA-R3-PT, 2019 WL 1422927, at *3 n.2 (Tenn. Ct. App. Mar. 29, 2019). Thus, we have previously recognized that the question of waiver of counsel in a termination matter is not identical to the question presented in a criminal matter.

Still, DCS appears to concede in its brief that the waiver of counsel in this case "must be 'voluntary knowing, and intelligent' and usually 'occurs only after a trial judge advises a defendant of the dangers and disadvantages of self-representation and determines that the defendant knows what he is doing and his choice is made with open eyes.'" For this proposition, however, DCS only cites law from the criminal context. *See State v. Maxwell,* No. M2009-00467-CCA-R3-CD, 2011 WL 915670, at *3 (Tenn. Crim. App. Mar. 16, 2011) ("[W]aiver of the right to counsel must be voluntary, knowing, and intelligent. In addition, waiver usually occurs only after the trial judge advises a defendant of the dangers and disadvantages of self-representation and determines that the defendant 'knows what he is doing and his choice is made with eyes open.") (internal citations and quotation marks omitted).

In a similar vein, Mother argues on appeal that there is no evidence in the record to support Magistrate Dodd's finding that Mother understood the consequences of the rejection or that her decision to waive counsel was "free and voluntary." Mother further argues that the signature on the waiver form was "not authenticated on the record" because no witness was asked about this document at the termination trial. Finally, Mother argues that this case was "founded upon the allegation that Mother has some mental defect or lack of capacity to care for the child" and that the waiver cannot be effective without "an attempt to determine whether Mother's alleged mental deficit impairs her ability to understand the grave decision of rejecting appointed counsel."

Respectfully, we disagree. Here, the record contains a waiver of the right to appointed counsel that bears Mother's signature. Mother presented no evidence and no argument at trial that the signature on this waiver was not her own or that she did not voluntarily sign this document. Indeed, Mother's brief concedes that this document "appears to bear Mother's signature." This document specifically provides that Mother signed the waiver "with full knowledge of the consequences of my decision[.]" This document therefore meets the requirement under Rule 13(f) for a signed waiver of the right to appointed counsel.

We also disagree with Mother's assertion that the lack of evidence in the record as to Mother's understanding and competence is fatal to this case. As explained by the Tennessee Supreme Court in the context of a criminal prosecution:

> The determination of whether a defendant has exercised his or her right of self-representation and has concurrently waived his or her right to counsel is a mixed question of law and fact. *United States v. Kimball*, 291 F.3d 726, 730 (11th Cir. 2002); *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990); *Spencer v. Ault*, 941 F. Supp. 832, 851 (N.D. Iowa 1996); *State v. Jordan*, 118 Conn. App. 628, 984 A.2d 1160, 1166 (2009); 1 Kevin F. O'Malley et al., *Federal Jury Practice & Instructions* § 5:6 (6th ed. 2009).

- 17 -

Tennessee appellate courts review "mixed questions of law and fact de novo, accompanied by a presumption that the trial court's findings of fact are correct." ***State v. Holmes***, 302 S.W.3d 831, 837 (Tenn. 2010).

***Hester***, 324 S.W.3d at 29–30. Moreover, "'the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself.'" ***Id.*** at 31. (quoting ***Godinez v. Moran***, 509 U.S. 389, 399, 113 S. Ct. 2680, 125 L.Ed.2d 321 (1993)). "The United States Supreme Court has declared that "a criminal defendant's ability to represent himself [or herself] has no bearing upon his [or her] competence to *choose* self-representation." ***Godinez***, 509 U.S. at 400, 113 S. Ct. 2680. Thus, a litigant's "lack of capacity to present an effective defense is not a basis for denying the exercise of the right of self-representation." ***Hester***, 324 S.W.3d at 32 (citing ***State v. Herrod***, 754 S.W.2d 627, 630 (Tenn. Crim. App. 1988)). As our supreme court has explained:

> A trial court may properly conclude that a defendant is likely to be incompetent and ineffective as an advocate in his or her own defense and that the defendant lacks important knowledge about substantive and procedural law; however, these conclusions, without more, do not render the defendant incompetent or unable to waive the right to counsel. Deficiencies in legal skills and legal knowledge do not deprive a person of his or her right to self-representation.

***Id.*** at 32.

In this case, Magistrate Dodd made an explicit finding that he explained Mother's options regarding appointed counsel in "great detail." The magistrate's order further stated that he explained the consequences of Mother's decision, in that she would need to be prepared to go to trial on the date set by the trial court. Magistrate Dodd further found that Mother was questioned under oath about her competency "to understand today's proceedings." As a result of Mother's testimony under oath, Magistrate Dodd ruled that Mother would be allowed to represent herself going forward.

To the extent that Mother now takes issue with our inability to evaluate these findings due to the lack of a record as to Mother's testimony on September 5, 2019, it is Mother's own failure to provide this Court with a record that results in the lack of evidence to evaluate. Here, Mother has filed no transcript or statement of the evidence from the September 5, 2019 hearing. "When no transcript or statement of the evidence is included in the record on appeal, we conclusively presume that the findings of fact made by the trial court are supported by the evidence and are correct." ***In re M.L.D.***, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005).

Mother cites no law to suggest that this presumption is inapplicable in this context.

- 18 -

Indeed, our research reveals that it is. Specifically, in *State v. Hufford*, No. E2012-02162-CCA-R3-CD, 2014 WL 4403831 (Tenn. Crim. App. Sept. 8, 2014), the defendant argued on appeal that the trial court did not "protect his right to counsel during the proceedings." *Id.* at *7. The State argued that the issue was waived because the defendant failed to provide a transcript from the hearing in which the issue of counsel was decided. *Id.* We agreed with the State:

> Appellant had the benefit of appointed counsel prior to his first trial. He filed a motion to dismiss his attorney and proceed *pro se.* He executed an appropriate "Waiver of Counsel" form, which was included in the record. However, appellant did not include a transcript of the hearing that contained a colloquy with the trial court. It is appellant's responsibility to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues forming the basis of the appeal. Tenn. R. App. P. 24(b). We will not presume error from a silent record. We must conclude that appellant's first waiver of counsel was not in error.

*Hufford*, 2014 WL 4403831, at *7. Other courts have come to similar conclusions under somewhat similar circumstances. *Cf. State v. Jones*, No. M2015-00720-CCA-R3-CD, 2016 WL 3621513, at *9 (Tenn. Crim. App. June 29, 2016) (holding that the defendant could not show reversible error in the trial court's denial of his purported request to proceed pro se because "[w]ithout the transcript of the March 1, 2013 hearing, we must presume that the trial court was correct when it ruled that Defendant's request, made three days before the scheduled trial date, was merely a delay tactic"); *see also Freels v. Jones*, No. E2002-00895-COA-R3-CV, 2003 WL 104621, at *1 (Tenn. Ct. App. Jan. 13, 2003) (citing *Turner v. Turner*, 739 S.W.2d 779 (Tenn. Ct. App. 1986)) (holding that the defendant could not show a reversible error in the failure to have a jury trial because the trial court "found that defendant had waived her right to a jury trial, and absent any transcript of evidence to show otherwise, this Court must presume that the evidence would support the [t]rial [c]ourt's ruling"). Thus, even in the criminal law context, with its heightened procedures, a party's failure to present a proper record upon which this Court can evaluate the trial court's decision has proven fatal to his or her argument on appeal.

We certainly agree that Mother's conduct at trial indicated that she lacked important knowledge to be an effective legal advocate on her own behalf. And as we have found *infra*, Mother's mental health issues persist in a manner that persuades us that returning the child to her would be unsafe. But as the Tennessee Supreme Court has made clear, those conclusions do not necessarily render Mother incompetent to waive the right to counsel; instead, those are distinct questions. Here, Magistrate Dodd was tasked with making the determination as to whether Mother could and did waive her right to counsel. After hearing Mother testify under oath and having Mother complete the required written waiver, Magistrate Dodd found that Mother had effectively waived her right to appointed counsel. The record on appeal contains neither a transcript nor a statement of the evidence from the

September 5, 2017 hearing. We therefore must presume that the trial court's implicit and explicit findings that Mother was both competent to execute the waiver and did so voluntarily are correct on appeal. And at trial, while Mother testified on her own behalf, she did not present any testimony concerning her mental health diagnoses or anything remotely relevant to the question of whether she could understand the consequences of her waiver of appointed counsel that occurred in September 2017.[17] While Mother's ability to parent due to her mental health issues is squarely at issue in this case, without some evidence presented to show that Mother could not properly understand the waiver of her right to counsel or did not do so voluntarily, we cannot disturb the ruling in the trial court. The trial court therefore did not err in proceeding to hear the termination petition despite Mother's pro se status.

## B. Grounds for Termination

### I.   Substantial Noncompliance with Permanency Plans

Pursuant to Tennessee Code Annotated section 36-1-113(g)(2), a ground for termination exists when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]" As discussed by this Court in *In re M.J.B.*, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine*, 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*Id.* at 656–57.

---

[17] Indeed, the evidence presented by DCS indicates that Mother repeatedly refused to sign releases that would have made Mother's mental health records available to them.

Six permanency plans were created following the removal of the child. The plans generally required that Mother (1) maintain safe and stable housing and provide proof of same to DCS; (2) obtain required services through her insurance or inform DCS of the termination of her insurance; (3) obtain and maintain stable employment and provide proof to DCS; (4) provide DCS with updated contact information as necessary; (5) present herself to DCS and to the trial court; (6) complete a psychological evaluation and follow all recommendations; (7) allow DCS to complete home visits; (8) sign a release of information form allowing DCS to obtain records from her physicians and service providers; (9) develop a child care and transportation plan; (10) submit to and pass drug screens; and (11) complete an alcohol and drug assessment and follow recommendations. A fourth permanency plan included a requirement that Mother complete an additional psychological evaluation and follow recommendations, maintain a bond with the child, and demonstrate appropriate parenting behaviors. Two additional permanency plans were created that included these requirements.

We begin with the question of whether Mother's responsibilities under the plans were "reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place[.]" *In re M.J.B.*, 140 S.W.3d at 656. Here the trial court found that the plans' requirements were reasonable and related to the reasons that necessitated removal both at the conclusion of the termination trial. The trial court further found that Mother's responsibilities were explained to her in detail. Mother does not argue that the plans' requirements were unreasonable or unrelated to the conditions that led to the removal of the child. Instead, Mother raises as a separate issue that DCS and the trial court violated Mother's rights by attempting to force her into unwanted medical treatment, citing Tennessee Code Annotated section 33-6-401. Section 33-6-401 provides as follows:

> IF AND ONLY IF
> (1) a person has a mental illness or serious emotional disturbance, AND
> (2) the person poses an immediate substantial likelihood of serious harm under § 33-6-501 because of the mental illness or serious emotional disturbance,
> THEN
> (3) the person may be detained under § 33-6-402 to obtain examination for certification of need for care and treatment.

Tennessee Code Annotated section 33-6-402 further provides as follows:

> If an officer authorized to make arrests in the state, a licensed physician, a psychologist authorized under § 33-6-427(a), or a professional designated by the commissioner under § 33-6-427(b) has reason to believe that a person is subject to detention under § 33-6-401, then the officer, physician,

psychologist, or designated professional may take the person into custody without a civil order or warrant for immediate examination under § 33-6-404 for certification of need for care and treatment.

*See also* Tenn. Code Ann. § 33-6-404 (involving the situation where a person "is brought to" a medical provider "for examination under this section" to determine "whether the person is subject to admission to a hospital or treatment resource under § 33-6-403"); *cf.* Tenn. Code Ann. § 33-6-403 (involving the question of whether a person "may be admitted and detained by a hospital or treatment resource for emergency diagnosis, evaluation, and treatment under this part").

To the extent that this argument requires us to engage in statutory construction, we follow the familiar rules applicable to that inquiry:

> "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995) (citing *State v. Sliger*, 846 S.W.2d 262, 263 (Tenn. 1993)). "The text of the statute is of primary importance." *Mills v. Fulmarque*, 360 S.W.3d 362, 368 (Tenn. 2012). A statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says. *See* *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997).

*In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015).

Our review of the text of the above statutes persuades us that they are simply inapposite here. Section 33-6-401 clearly provides that only if its requirements are met can an individual "be detained" under section 33-6-404. Likewise, section 33-6-404 speaks in terms of taking an individual "into custody." In determining the meaning of a statute, we must determine the Legislature's intent without "unduly . . . expanding [the] statute's coverage beyond its intended scope." *Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d 73, 83 (Tenn. 2001). The statutes cited by Mother clearly involve a situation wherein an individual is physically detained for purposes of providing treatment. *See* Tenn. Code Ann. 33-6-401 (concerning whether an individual may "be detained"); Tenn. Code Ann. 33-6-402 (concerning the situation where an individual is taken "into custody" for treatment); Tenn. Code Ann. 33-6-404 (involving an examination to determine whether to release an individual or if "the person is subject to admission"). In this case, Mother was never taken into custody for the purposes of mental health treatment, nor was the question of her admission to any facility ever at issue. Indeed, Mother concedes in her appellate brief that "Mother was not physically coerced into psychological diagnosis and treatment[.]" As such, this situation simply is not governed by the cited statutes. Indeed, our research has indicated that none of the cited statutes have ever been cited in

the context of a child protective action.

Mother argues, however, that DCS nevertheless sought to coerce Mother to obtain mental health treatment by making it a condition to exercise her fundamental right to parent her child. Moreover, Mother contends that these requirements were based on nothing more than "allegation[s] of psychological problems." As result, Mother argues that we should hold that DCS cannot rely on grounds for termination that rely on Mother's refusal to participate in mental health treatment in the absence of compliance with Section 33-6-404. Respectfully, we disagree.

DCS correctly points out in its brief that the State has a compelling interest in protecting children from harm. *See Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 524 (Tenn. 1993) (quoting *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126–27 109 S. Ct. 2829, 106 L.Ed.2d 93 (1989)) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors."). The right to parent children is therefore not absolute. *See In re S.M.*, 149 S.W.3d 632, 638–39 (Tenn. Ct. App. 2004) ("While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination."). Consequently, the State may interfere with a parent's fundamental right when there is a risk of substantial harm to a child. *See Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993) ("In light of this right to privacy, we believe that when no substantial harm threatens a child's welfare, the state lacks a sufficiently compelling justification for the infringement on the fundamental right of parents to raise their children as they see fit.").

The Tennessee Legislature has recognized that mental health issues may result in substantial harm to a child, as a ground for termination exists when the parent's present mental condition renders the parent incompetent to adequately parent the child. *See* Tenn. Code Ann. § 36-1-113(g)(8). And Tennessee courts have held that mental health issues can justify interference in the parental-child relationship due to the substantial harm that it can cause children. *See, e.g.*, *State v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990) ("The holding of the Court of Appeals in this case—that 'mental disability' cannot be the basis of termination of parental rights since the acts of the mentally disabled parent are not willful—would nullify a significant part of the legislative plan for the welfare of dependent and neglected children. An obvious result of the holding is to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home.").

In this case, the trial court entered an order on May 5, 2017, finding that the child was "subject to an immediate threat of harm" and placing the child in DCS custody. Later, Mother chose to waive her right to the probable cause hearing. And finally, the juvenile court entered an order, upon Mother's own stipulation, adjudicating the child as dependent

and neglected. Thus, it was a judicial finding of substantial harm, not merely an allegation, that justified DCS's interference with Mother's fundamental parental rights. And based on the removal of the child, DCS had both the right and the responsibility to create permanency plans with action steps for Mother to complete in order to achieve the goals of the plans. *See generally* Tenn. Code Ann. § 37-2-403 (governing the requirement that DCS create a permanency plan within thirty days of foster care placement).

Moreover, the agreed order of disposition in the dependency and neglect action provided that Mother "stipulate[d] and consent[ed] to the findings of fact and conclusions of law contained herein." One of those findings was that Mother would consistently participate in counseling and complete an additional mental health assessment. Thus, Mother, by and through her attorney, voluntarily agreed to complete these tasks. *See Memphis Bd. of Realtors v. Cohen*, 786 S.W.2d 951, 953 (Tenn. Ct. App. 1989) (citing *Moody v. Moody*, 681 S.W.2d 545 (Tenn. 1984)) ("While defendant may have a grievance against her attorney, as to the other party to the suit she is bound by the attorney's knowledge and his actions in her behalf.").

Finally, we note that Mother's argument essentially attacks the findings made and the requirements put in place in the dependency and neglect action. Nothing in the record, however, indicates that Mother ever appealed any of the rulings from the dependency and neglect matter, despite the fact that she was represented when the dependency and neglect order was entered. Thus, the orders from the dependency and neglect action are final and cannot now be attacked.[18] *See In re Jimmy B.*, No. E2015-02070-COA-R3-PT, 2016 WL 2859180, at *6 (Tenn. Ct. App. May 11, 2016) (declining to entertain father's collateral attack of the juvenile court's dependency and neglect order in the termination of father's parental rights proceeding because they are "separate proceeding[s]"). Thus, the only question in this case involved whether the permanency plans' requirements were reasonable and related to the issues that caused the child to come into custody; if so, DCS is entitled to rely on Mother's substantial noncompliance therewith as a ground for termination of her parental rights.

We also cannot conclude that it was unreasonable for DCS to insist in its permanency plans that Mother complete tasks related to her mental health, as those tasks clearly appear related to the issues that led to DCS involvement in this case. Indeed, the proof showed that DCS first became involved in this case when Mother reported to the hospital that she was having trouble making decisions as to the child due to mental health issues and was acting erratically at the hospital. Although DCS did not initially believe that

---

[18] We note that while Mother asserted in the termination trial that she had not been served with the dependency and neglect petition, she did not raise this argument on appeal. Moreover, the record on appeal contains a summons from the dependency and neglect action that was served on Mother on September 6, 2017. Mother also participated in the dependency and neglect action by and through her counsel without ever objecting to the lack of service of a summons or personal jurisdiction. Thus, even to the extent that this issue is at all relevant to this action, it lacks merit.

removal was necessary, Mother's mental health issues became more pronounced when DCS met with Mother in the days following the hospital visit. Mother's behavior gave DCS serious concerns about her mental health, leading ultimately to the removal of the child and DCS's insistence that she complete certain mental health requirements.

We have generally held that expert proof is not required to show "the effect of a parent's mental illness on his or her ability to parent a child[.]" *In re Shaneeque M.*, No. E2014-00795-COA-R3-PT, 2014 WL 6499972, at *9 (Tenn. Ct. App. Nov. 20, 2014) (concerning the ground for termination related to a present mental condition that prevents a party from adequately caring for a child). Mother's own interactions with DCS workers and visitation supervisors confirmed that her mental health was at issue. Mother was certainly free to ignore DCS's recommendations, but she did so at the risk that her refusal could prevent reunification with the child, so long as her mental health issues continued to place the child at substantial risk of harm. Simply put, Mother's fundamental right to refuse treatment did not mean that DCS had to sit idly by when Mother's untreated mental health issues presented a risk of substantial harm to the child. Thus, we hold that DCS was entitled to rely on grounds for termination that implicate Mother's mental health and her refusal to comply with reasonable requests to remedy issues related to that issue, without compliance with Tennessee Code Annotated section 33-6-401 and its related statutes. Moreover, we conclude that the evidence does not preponderate against the trial court's finding that the plans' requirements were reasonable and related to the conditions that led to the removal of the child.

Mother next argues that she did substantially comply with the requirements of the plans. We agree that Mother did meet many requirements, as there were no concerns with her housing, her income, or her drug use at the time of trial. The trial court also made no finding that Mother failed to create a transportation plan or complete an alcohol and drug assessment.

But as DCS points out, the central focus of this case was Mother's mental health. And the requirements related to this issue are where Mother's compliance was woefully deficient. For example, while Mother did complete a psychological assessment, the testimony indicated that she did not follow the recommendations, such as regularly attending counseling. Instead, throughout the nearly thirty-three months that the child was in DCS's physical custody, Mother attended only three counseling sessions, and her counselor reported that she did not focus on treatment. As a result, another mental health assessment was recommended; while Mother sometimes agreed that she would complete this assessment, she ultimately refused to do so. Mother also declined DCS's offer of assistance in obtaining this assessment and yet failed to determine whether her insurance would cover the cost. This refusal to check her insurance coverage was typical of Mother's behavior throughout the pendency of this case. Mother also refused on multiple occasions to sign releases allowing DCS to obtain her medical records, or later revoked the releases that she did sign.

Finally, the proof concerning Mother's conduct at the visitations indicated that Mother's mental health issues did not improve over the time that the child was in custody; indeed, in July 2019, visitations were terminated because of Mother's erratic and aggressive behavior. Thus, Mother efforts were deficient in completing the actions steps related to maintaining a bond with the child and demonstrating appropriate parenting behaviors during visitation.

As previously discussed, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Thus, a parent's completion of many tasks may still constitute substantial noncompliance when the parent made little effort to complete the tasks that relate to the "central requirements" of the plans that "are integral to the successful reunification of th[e] family." *In re Aaralyn O.*, No. W2017-01411-COA-R3-PT, 2018 WL 468246, at *10 (Tenn. Ct. App. Jan. 18, 2018). In a similar situation, we explained as follows:

> It is quite evident from the record before us that the primary reason for Mother's inability to properly care for her children was her ongoing drug dependency and thus, we agree with the juvenile court's conclusion that her failure to comply with her plans' requirement that she lead a drug free lifestyle constitutes substantial noncompliance.

*In re J.C.D.*, 254 S.W.3d 432, 442 (Tenn. Ct. App. 2007); *see also In re Destiny S.*, No. M2016-00098-COA-R3-PT, 2016 WL 4186731, at *9 (Tenn. Ct. App. Aug. 4, 2016) (affirming the ground of substantial noncompliance where the parent completed some tasks but failed to complete the tasks related to sobriety, the "primary concern in this case from the very beginning"). Here, the record reflects that the primary issue preventing reunification was Mother's mental health, including her erratic behavior, paranoia, and aggression toward her own child. Mother made very little effort to complete any of the requirements that related to her ongoing mental health issues. As a result, we cannot conclude that the trial court erred in concluding that Mother's noncompliance with the permanency plans was substantial under the circumstances. This ground for termination is therefore affirmed.

## 2. Abandonment by Failure to Visit

DCS next argues Mother's parental rights should be terminated on the ground of abandonment by failure to visit, pursuant to Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1). Section 36-1-113(g)(1) states that termination of parental rights may be based upon "[a]bandonment by the parent or guardian, as defined in § 36-1-102." At the time of the filing of the termination petition, section 36-1-102(1)(A)(i), in turn, defined "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Failure to visit refers to

> the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period[.]

Tenn. Code Ann. § 36-1-102(1)(E). Token visitation, in turn, is defined as "visitation, under the circumstances of the individual case, [which] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C). Under Tennessee Code Annotated section 36-1-102(1)(I), as amended,

> it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

"Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true." *McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 825 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)).

Here, the relevant four-month period is March 19, 2019 to July 18, 2019. There is no dispute that while Mother was late for some of the visits and some of the visits were cut short, Mother did in fact attend all of the visits that were provided to her by DCS during this time. This led the trial court to find that Mother visited the child "on a fairly regular basis." The central focus of the trial court's findings as to this ground for termination was

not, however, on the quantity of visits exercised by Mother, but the quality of those visits. Specifically, the trial court made detailed findings as to Mother's conduct at each visit that occurred in the four-month period, finding that with the exception of a single visit in the four-month period, in each and every visit, there were significant issues with Mother's conduct. Some of these issues included acting erratically, becoming unreasonably angry with the child, yelling at the child, frightening the child, threatening to take the child to the hospital, being aggressive toward the child, acting indifferently toward the child, expecting behavior beyond the child's current development, becoming paranoid about the child's safety or privacy, refusing to play with the child even when asked, refusing to end the visits as asked, telling the child that he was coming home tomorrow without basis, holding the child down, demanding that the child bond with her rather than performing the tasks that the supervisor asserted would naturally create a bond, playing on her phone rather than attending to the child, talking with the supervisor about her case instead of interacting with the child, claiming that she had multiple degrees and professions, bringing in items smelling of alcohol, showing the child inappropriate pictures of violence on her phone, and arguing with the child. These issues did not seem to improve as time went on, but actually appeared to worsen, resulting in the suspension of Mother's visitation shortly after the termination petition was filed.

On appeal, Mother argues that the trial court's focus on the quality of the visits was inappropriate. Instead, Mother contends that under the definition of token visitation in section 36-1-102, the only question is whether Mother's visits were perfunctory, infrequent, or of short duration. As Mother states, "[b]ad visits are not the same thing as infrequent perfunctory visits." Respectfully, we must disagree.

Whether a visit is token "under the circumstances of the individual case" is a particularly fact-intensive inquiry. Tenn. Code Ann. § 36-1-102(1)(C); *In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010). In making this determination, courts look at the "frequency, duration, and quality of the visits that occurred." *In re Keri C.*, 384 S.W.3d at 750. We also consider any evidence of "the parent's conduct and the relationship between the child and the parent up to this point." *Id.* at 749. Based on this law, we have previously affirmed a finding on this ground when the parent appeared at every weekly visitation that he was able prior to incarceration, but the visitation was nevertheless token in nature because the parent was physically aggressive and inappropriate with the children. *In re Joseph G.*, No. E2012-2501-COA-R3-PT, 2013 WL 3964167, at *9 (Tenn. Ct. App. July 31, 2013) (also concluding that the mother's few visits were perfunctory because the mother was intoxicated, verbally abusive, and inappropriate with the children). In another case, the mother attended all but two visitations that were provided during the four-month period. *See State Dep't of Children's Servs. v. L.L.T.*, No. E2003-00501-COA-R3-JV, 2003 WL 23094559, at *4 (Tenn. Ct. App. Dec. 30, 2003). But the DCS caseworker testified that the mother fell asleep during some of the visits, was intoxicated during some sessions, and got into an argument with father during some sessions. *Id.* We therefore affirmed the trial court's finding that the mother's visitation was merely "perfunctory" and

that the mother had in fact failed to visit the child in more than a token fashion. *Id.*

We cannot deny that this case is unusual. Here, Mother attended every single visitation that was permitted by DCS in the relevant period. But she did not spend all of her allotted time with the child, as she was sometimes late and some visits were cut short due to her own conduct. While quantity may be in Mother's favor, quality certainly is not. Here, the evidence supports the trial court's findings that Mother's visits were more often than not, fraught with deplorable conduct by Mother. Indeed, it appears that the visits with the child were counter-productive, as Mother's escalating aggression and erratic behavior caused the child to grow frightened of her. Mother was not able to string together even two visits in a row that did not suffer from serious issues. As a result, the visits were not helpful in developing any meaningful bond with the child. As a whole, we cannot conclude that the evidence preponderates against the trial court's finding that Mother's visits were only token under the circumstances. DCS therefore proved this ground by clear and convincing evidence.

### 3. Abandonment by Failure to Establish a Suitable Home

DCS also argues that Mother abandoned the child in another way, by failing to establish a suitable home for the child. Under Tennessee Code Annotated section 36-1-102(a)(1)(A)(ii), abandonment may be found under the following circumstances:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

. . . .

Providing a suitable home "requires more than providing a proper physical living location." *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (citations, quotation marks, and alterations omitted). A parent's failure to address mental health issues can also lead to a finding that the parent has failed to establish a suitable home. *See, e.g.*, *In re Draven K.*, No. E2019-00768-COA-R3-PT, 2020 WL 91634, at *8 (Tenn. Ct. App. Jan. 7, 2020) ("Mother's failure to address her mental health issues renders her unable to provide a safe and stable environment for the child and shows a lack of concern for the child and a lack of interest in regaining custody."); *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *12 (Tenn. Ct. App. Apr. 11, 2018) ("Mother's own failure to comply with her mental health treatment regimen demonstrated her lack of concern for the Children and resulted in her inability to provide a suitable home environment.").

Here, Mother does not dispute that the conditions in subsections (a) and (b) are satisfied: the children were removed by the juvenile court dependency and neglect orders and placed in DCS custody, and the trial court found that reasonable efforts were made by DCS to prevent the removal of the child. Moreover, Mother does not assert that DCS failed to make reasonable efforts in this case, as the trial court specifically found. We agree that they did. Here, DCS provided Mother with a variety of services following the removal and throughout the pendency of this case. *Cf. In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) ("As long as the proof relates to 'a period of four (4) months following the removal,' Tenn. Code Ann. § 36-1-102(1)(A)(ii), the ground may be established. The statute *does not* limit the court's inquiry to a period of four months *immediately* following the removal."). This includes assisting Mother with obtaining assessments and counseling services, setting up supervised visitation, repeatedly informing Mother of the tasks that she was required to complete, and attempting to assist her in completing those tasks. Thus, the trial court's finding that DCS's efforts were reasonable is affirmed.

Mother argues, however, that DCS failed to present clear and convincing evidence that her home was unsuitable. In this case, there is no dispute that Mother's physical home is suitable for a child. Instead, the trial court relied again on Mother's unaddressed mental health concerns as the basis for this ground, citing "Mother's failure to participate in individual counseling, sig[n] releases and complete a more in-depth psychological evaluation[.]" Thus, the trial court found that "Mother is unable to provide a suitable home due to her refusal to address her mental/emotional health issues that created barriers to not only visitation but reunification." We agree. As previously discussed, Mother failed to attend more than three individual counseling sessions and failed to complete the recommended second assessment, even after agreeing to do so. Moreover, Mother's conduct at the visitations before they were suspended indicated that her behavior was not safe for the child, even in that highly supervised situation. Mother vacillated between

extreme interest, aggression, indifference, and anger. She did not make significant progress in her parenting skills. Thus, Mother's own behavior demonstrates a lack of concern for the child such that it appears unlikely that she will be able to provide a suitable home for him at an early date. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). This ground for termination is therefore affirmed.

### 5. Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody

The next ground upon which DCS relies, and which the trial court found, is that Mother failed "to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child, and placing the child in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). As the Tennessee Supreme Court explained,

> section 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted).

We begin with the willingness and ability prong. "Ability focuses on the parent's lifestyle and circumstances." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)). "When evaluating willingness, we look for more than mere words." *Id.* (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018)). "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody. . . ." *Id.* Although we may consider evidence from both before and after the petition was filed, *see In re Maya R.*, 2018 WL 1629930 at *7, a parent's ability and willingness may be measured as of the time the petition is filed. *See In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *7 (Tenn. Ct. App. Feb. 8, 2019) (citing *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)).

Here, the trial court again based its finding on this ground on Mother's unaddressed mental health issues: "Mother has unaddressed emotional and/or mental health issues that would pose a risk of substantial harm to this Child's physical and psychological welfare if the Child was returned to the Mother's care." Mother's only argument in response to this

ground is that she cannot be forced into psychiatric treatment or testing without compliance with Tennessee Code Annotated section 33-6-401. As previously discussed, however, DCS was not required to comply with section 33-6-401, and it was reasonable for DCS to require Mother to obtain mental health testing and treatment in this case.

We agree with the trial court that Mother has not exhibited the ability or willingness to personally assume physical custody of the child. As previously discussed, Mother has refused to participate in the treatment that is clearly necessary to address her mental health concerns. Thus, Mother has made little effort to overcome the obstacles that prevent reunification. *See* **In re Cynthia P.**, 2019 WL 1313237, at *8. Mother also has not demonstrated the ability to parent the child in a safe and appropriate manner during supervised visitations. Instead, the visits were suspended due to Mother's inappropriate behavior, which caused the child to become frightened of her. Accordingly, DCS has shown that Mother has manifested neither the ability nor a willingness to assume physical custody of the child.

The second prong of this ground involves whether the children would suffer substantial harm if returned to her custody. As we have explained regarding this prong:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

**Ray v. Ray**, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted). Here, we agree with the trial court that Mother's unaddressed mental health issues pose serious risk of substantial harm to the child. Mother has not had unsupervised visitation with the child in nearly three years. And she has had no visitation with him of any kind in over ten months by the time of trial. The visits were terminated because Mother's own behavior was highly inappropriate; she was at times aggressive, indifferent, or angry with the child. Mother's conduct caused the child to become frightened. As a result, we have little difficulty affirming the trial court's finding that returning the child to Mother would pose a risk of substantial harm to the child.

### 6. Persistence of Conditions

The final ground DCS relies on is persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

There is no dispute in this case that the child was removed from Mother's custody for a period of six months by an order entered in a dependency and neglect action. Thus, the dispositive questions are whether conditions persist that prevent the safe return of the child, whether the conditions will likely be remedied at an early date, and whether the continued relationship prevents early integration of the child into a stable, permanent home. As we have previously explained,

> "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No.

- 33 -

W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016).

Mother's argument as to this ground is sparse. As we perceive it, Mother essentially argues that the conditions that led to the removal initially, that she lacked appropriate materials to care for an infant and that she was not in her "right mind to make medical decisions," had been remedied.[19] Mother further argues that the only significant condition that arose after the removal was her reluctance to submit to psychological testing and treatment. As to this condition, Mother again contends that DCS was not permitted to coerce Mother into mental health treatment, which we will not further address. As previously discussed, DCS was entitled to require Mother to submit to mental health treatment and testing prior to reunification under the facts of this case.

Moreover, as we have repeatedly stated, Mother's mental health issues continued to persist at the time of trial. Mother's visits with this child in the Spring and Summer of 2019 provide a clear indication that Mother's unaddressed mental health issues prevented her from appropriately parenting her child; not only did Mother never have consistent enough interactions with the child to progress to unsupervised visitation, her visitation was terminated due to her own conduct. Thus, these conditions "in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" Tenn. Code Ann. § 36-1-113(g)(3). There was also little likelihood that these conditions would be remedied at an early date, as Mother repeatedly refused to participate in meaningful mental health treatment or to listen in any way to DCS's advice.[20] The proof also shows that the child is in a loving pre-adoptive home. A continued relationship with Mother prevents the child from achieving permanence with the family that has cared for him for three years. As a result, this ground for termination is likewise affirmed.

## C. Best Interest

---

[19] Mother does not actually state in her brief that these conditions were remedied. In her reply brief, she asserts that there was no evidence that these conditions even existed, somewhat of a change from her argument in her initial brief. Regardless, the persistent conditions ground makes clear that it applies to both conditions that caused the removal and "other conditions" that become apparent following the removal. *See In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at \*6 (Tenn. Ct. App. Nov. 25, 2019) ("This ground for termination, however, is not limited only to those conditions that led to the child's removal, but allows the court to also consider "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A). Thus, neither the trial court nor this Court is confined in our review only to those conditions that were expressly found to support the dependency and neglect findings.").

[20] Even during trial when DCS testified about the advice that they gave Mother about safe parenting, Mother objected that DCS could not tell her how to parent her child.

- 34 -

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607.

The statutory factors that courts should consider in ascertaining the best interest of the children include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[21] "This list is not exhaustive, and the statute does not

---

[21] This is the version of section 36-1-113(i) that was in effect when the termination petition was filed. The Tennessee General Assembly amended the statutory best interest factors in 2021. *See* 2021 Tenn.

require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." ***In re M.A.R.***, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

Again, Mother's argument here is sparse at best. Although Mother concedes "that to a great extent the record supports the Juvenile Court's findings of fact" with regard to best interest, Mother argues on appeal that the trial court's order fails to address the nine factors above. We respectfully disagree. Although the trial court did not explicitly reference the above factors by number, the trial court's order contains detailed findings of fact as to best interest that clearly correspond to each of the above factors. For example, in subsection (b) of the trial court's best interest findings, the trial court found that Mother "failed to make changes in her conduct and she has failed to make an adjustment of her circumstances and/or conditions as to make it safe for the Child to go back into the Mother's home[.]" This clearly references best interest factor (1). Likewise, in subsection (b), the trial court noted that Mother was unable to make changes despite "herculean" efforts by DCS. This clearly references best interest factor (2). In our review of the trial court's findings, it appears that it properly addressed seven of the nine best interest findings.[22] This is more than sufficient for appellate review in this case. *See **In re M.A.R.***, 183 S.W.3d at 667 (Tenn. Ct. App. 2005) (holding that every single factor need not be examined).

We further agree with the trial court that the factors favor termination in this case. The trial court was correct that Mother has been unable to make a lasting adjustment of circumstances so as to make the return of the child safe, despite the best efforts of DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). The evidence also does not preponderate against the trial court's finding that while Mother maintained visitation with the child, it was "harmful to the Child's wellbeing and the visits were not constructive toward creating a bond or relationship with the child." As a result, the evidence supports the trial court finding that "there is not a bond between the Mother and the Child" and that other than a single visit, there was "never any positive interactions between the Mother and the Child during visits[.]" *See* Tenn. Code Ann. § 36-1-113(i)(3), (4). The evidence also clearly shows that the child is thriving with and bonded to his pre-adoptive family and that any

---

Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. Neither party asserts that the revised version of the statute is applicable in this case.

[22] Mother's brief correctly points out that the when the trial court reaches the final two best interest factors, the trial court's order contains clear omissions and references to individuals that were not part of the proof in this case. These appear to be mere typographical errors. Moreover, the trial court's findings of fact are extremely detailed and responsive to the proof that was presented in this case. *Cf.* ***In re Colton B.***, No. M2017-00997-COA-R3-PT, 2017 WL 6550620, at *4 (Tenn. Ct. App. Dec. 22, 2017) (holding that a trial court's final termination order was insufficient when the order, *inter alia*, contained "not a single mention of any of the proof presented at the termination hearing, such as the testimony of the witnesses or the depositions submitted as exhibits"). As such, to the extent that these issues are errors, they are harmless. *See* Tenn. R. App. P. 36(b).

change in caretakers would therefore be "extremely detrimental to his emotional well-being and [] would result in extreme psychological harm to the Child[.]" *See* Tenn. Code Ann. § 36-1-113(i)(5). The trial court further found that Mother's behavior during the visitation rose to the level of psychological abuse, as her conduct was traumatic for the child; the evidence does not preponderate against this finding. *See* Tenn. Code Ann. § 36-1-113(i)(6). And of course, as the trial court found, Mother's mental health and her refusal to seek help "created a significant barrier in achieving permanency for the Child." *See* Tenn. Code Ann. § 36-1-113(i)(7). Thus, all of these above factors support termination in this case. Therefore, at best, only the two factors that were not specifically addressed by the trial court weigh against termination. *See* Tenn. Code Ann. § 36-1-113(i)(8), (9).

In sum, the vast majority of the factors at issue in this case favor termination. Importantly, while Mother did visit with the child before the visits were terminated, she was unable to parent effectively or to establish any meaningful bond with the child. "This Court has held that both the existence of a meaningful relationship and the lack of meaningful relationship may be considered important factors in the best interest analysis." *In re P.G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *16 (Tenn. Ct. App. Aug. 17, 2018) (citing *In re Addalyne S.*, 556 S.W.3d 774, 795 (Tenn. Ct. App. 2018)); *see In re Jayvien O.*, No. W2015-02268-COA-R3-PT, 2016 WL 3268683, at *9 (Tenn. Ct. App. June 7, 2016) (affirming a trial court's holding that termination was in the child's best interest where the trial court found that "'most importantly,' . . . a meaningful relationship had not been established between" the mother and child); *In re Terry S.C.*, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at *18 (holding that termination was in the children's best interest including because, "perhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them"). The child is in a safe, loving pre-adoptive home where he is bonded to his foster parents and siblings. Indeed, the child has spent more of his life with this family than he did in Mother's custody. The trial court's ruling that termination is in the child's best interest is therefore affirmed.

## V. CONCLUSION

The judgment of the Rutherford County Juvenile Court is affirmed as to both the grounds for termination and the finding that termination is in the child's best interest. The termination of Mother's parental rights is therefore affirmed. Costs of this appeal are taxed to Appellant Tesha L.B., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE